[Cite as *In re Guardianship of Rahbek*, 2020-Ohio-3223.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

IN THE MATTER OF:

THE GUARDIANSHIP OF:

WILLIAM D. RAHBEK,
AN INCOMPETENT

:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 17-19-11

Trial Court Case No. 1998-GDI-6

(Appeal from Common Pleas
Court – Probate Division)

. . . . . . . . . . .

O P I N I O N

Rendered on the 8th day of June, 2020.

. . . . . . . . . . .

WILLIAM R. ZIMMERMAN, JR., Atty. Reg. No. 0078925, 108 East Poplar Street, Sidney, Ohio 45365
    Appellee Guardian of the Estate/Attorney for Appellee

DAVID J. CUSACK, Atty. Reg. No. 0063880, 1195 D Meadow Bridge Drive, Beavercreek, Ohio 45434
    Attorney for Appellant Erika Tallet, Guardian of the Person

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Erika Tallet, daughter of William D. Rahbek, appeals from a judgment of the Shelby County Court of Common Pleas, Probate Division, which granted her Motion to Change Guardian and Application for Appointment of Guardian of Alleged Incompetent as to the guardian of her father's person, but denied her request to be substituted as guardian of her father's estate. For the following reasons, the trial court's judgment will be affirmed.

*Factual and Procedural History*

{¶ 2} The record, including the testimony from the May 13, 2019 hearing on Tallet's motion and application, establishes the following facts.

{¶ 3} In 1979, Rahbek, a veteran, was diagnosed with schizophrenia. In 1997 or 1998, the Veterans Administration (VA) determined that Rahbek, then 46 years old, was 100 percent disabled, and it awarded him back-pay to the time of his diagnosis. In July 1998, the trial court appointed Attorney Ralph Bauer as the guardian of the estate and person of Rahbek, who was determined to be incompetent. At that time, Rahbek's two children, Zachary and Erika, were in college and could not be bonded. Both children consented to the appointment of Bauer as their father's guardian.

{¶ 4} Tallet testified that her mother initially had primary contact with Rahbek, although Tallet stayed in regular contact with her father. Tallet's contact increased after she returned to Ohio in 2006.

{¶ 5} Bauer remained Rahbek's guardian until August 2006, at which time Attorney William R. Zimmerman Jr. was substituted as guardian of Rahbek's estate and person (Order, Aug. 21, 2006) and as counsel for the guardian (Order, Aug. 16, 2006). Tallet

began to express concerns to Zimmerman about the care her father was receiving at his group home, and she involved a VA social worker.

{¶ 6} On Thanksgiving Day 2008, Rahbek was moved to Hillside Assisted Living in Xenia. Tallet testified that the transition to Hillside was "wonderful," and Zimmerman provided her father "all the things that had been lost" at the prior home. Zimmerman testified that while Rahbek resided at Hillside, he (Zimmerman) visited approximately every two months and took Rahbek shopping, out to eat, and other places.

{¶ 7} In 2013, Rahbek began having significant issues with his bladder, which required him to have a catheter. Hillside was unable to adequately address Rahbek's medical needs, resulting in numerous hospitalizations for infections. To facilitate Tallet's communication with her father's physicians, and at Tallet's request, Zimmerman provided Tallet with a medical power of attorney for her father. Tallet arranged for a home health nurse to come to Hillside to assist her father with catheter care.

{¶ 8} On October 13, 2017, Hillside contacted Tallet because Rahbek was vomiting and not eating well, and it informed Tallet that he needed to go to urgent care. Tallet went to see Rahbek and took him to an emergency room. Rahbek was found to have a bowel obstruction; he was intubated and hospitalized for a week. Tallet arranged for Rahbek to go to Friends Care for rehabilitation after his release, where he stayed for approximately one month.

{¶ 9} In November 2017, Zimmerman moved the trial court for approval to relocate Rahbek from the assisted living facility to Tallet's home in Greene County due to Rahbek's need for an increased amount of care, which Tallet was willing to provide. Zimmerman stated in his motion that Rahbek's residing with Tallet would be more economically

feasible than paying an assisted living facility and would be in Rahbek's best interest. Zimmerman requested that Tallet be paid $1,125 monthly for Rahbek's room and board, share of utilities, food, and spending money for him. The trial court granted the motion on December 4, 2017. In January 2018, based on information from Tallet regarding the extensive nature of Rahbek's needs, Zimmerman asked the trial court to increase Tallet's monthly payment to $2,000. The trial court granted the increase.

{¶ 10} In March 2018, Rahbek had surgery on his brain for an abnormal build-up of fluids. After his release from the hospital, he went to Kettering Hospital's rehabilitation facility for a short time, then back to Tallet's home. In April, Rahbek began to decline physically, and he fell on May 2 at Tallet's home. The hospital found bleeding in the brain, requiring a second surgery. From May 15 to June 24, Rahbek stayed at Xenia Health and Rehab. While there, Rahbek had additional issues with his catheter, and Tallet again took her father to the hospital. At the end of June 2018, Tallet arranged for her father to go to Patriot Ridge Community, a nursing facility, upon his release from the hospital.

{¶ 11} In July 2018, Zimmerman notified the court that Rahbek had been moved to Patriot Ridge, because Rahbek was in need of daily specialized care that Tallet was no longer able to provide. At the time of the May 13, 2019 hearing, Rahbek continued to reside at Patriot Ridge in Greene County.

{¶ 12} On February 14, 2019, Tallet filed a Motion to Change Guardian and an Application for Appointment of Guardian of Alleged Incompetent. In her motion, Tallet wrote that she had "been the primary contact for all the Ward's health care needs and often has been the primary care provider." Tallet noted that Zimmerman had executed

a power of attorney in 2013 that purported to grant her authority to make medical decisions for her father. Tallet indicated that she had been the primary health care decision maker and provider for Rahbek for years, knew her father's needs, and was "capable of providing for his best interests better than anyone else." Tallet further stated that she had submitted an appropriate bond and had completed the necessary education to serve as guardian. Tallet indicated that, if she were named guardian, she intended to file a motion to transfer the case to Greene County, where both she and Rahbek resided. Tallet's brother consented to the appointment of his sister as guardian.

{¶ 13} The trial court held a hearing on Tallet's motion on May 13, 2019, during which Tallet and Zimmerman testified. Following the hearing, the court ordered the parties to file proposed findings of fact and conclusions of law. (Order, May 14, 2019.) Zimmerman filed his response on May 31, and Tallet responded on June 4.

{¶ 14} On July 18, 2019, the trial court ordered that Tallet be substituted as guardian of her father's person, but that Zimmerman continue as guardian of Rahbek's estate. Tallet appeals from the trial court's judgment.

*Removal of Guardian*

{¶ 15} Tallet's sole assignment of error states:

**Trial court erred by denying Appellant Erika Tallet's application to replace Appellee William R. Zimmerman, Jr. as Guardian of the Estate of William D. Rahbek.**

{¶ 16} Under R.C. 2111.02(A), probate courts have the power to appoint a guardian of the person, of the estate, or both of an incompetent. "A guardian of the person is responsible for the care and well-being of the ward." *In re Guardianship of*

*Santrucek*, 120 Ohio St.3d 67, 2008-Ohio-4915, 896 N.E.2d 683, ¶ 2, fn.1; *see* R.C. 2111.13. In contrast, a guardian of the estate is responsible for the management of the ward's property. *Santrucek* at ¶ 2, fn. 1; *In re Anderson*, 2d Dist. Montgomery No. 25367, 2013-Ohio-2012, ¶ 25; R.C. 2111.14. The guardian of the estate must manage the estate for the best interests of the ward, pay and collect just debts, defend suits against the ward, institute suits on behalf of the ward, and settle and adjust, when necessary or desirable, the assets that the guardian may receive in kind from an executor or administrator. R.C. 2111.14(A).

{¶ 17} R.C. 2111.06 requires the probate court to appoint the same person as guardian of the person and estate of the ward, "unless in the opinion of the court the interests of the ward will be promoted by the appointment of different persons as guardians of the person and of the estate."

{¶ 18} "Guardianship proceedings, including the removal of a guardian, are not adversarial but rather are in rem proceedings involving only the probate court and the ward." *In re Guardianship of Spangler*, 126 Ohio St.3d 339, 2010-Ohio-2471, 933 N.E.2d 1067, ¶ 53. The Ohio Supreme Court has explained that, "[b]ecause the probate court is the superior guardian, the appointed guardian is simply an officer of the court subject to the court's control, direction, and supervision. The guardian, therefore, has no personal interest in his or her appointment or removal." (Citations omitted.) *Id.*

{¶ 19} R.C. Chapter 2111 does not address the removal of a guardian of an incompetent ward. *Contrast* R.C. 2111.46 (addressing removal of a guardian of a minor). R.C. 2109.24, which concerns fiduciaries appointed by the probate court with respect to financial matters, permits the removal of a fiduciary if the fiduciary fails to make

and file a required inventory or accounting and the failure continues for 30 days after the fiduciary has been notified by the court of the expiration of the relevant time. That statute also allows the removal of a fiduciary, upon at least 10 days' notice, for "habitual drunkenness, neglect of duty, incompetency, or fraudulent conduct, because the interest of the property, testamentary trust, or estate that the fiduciary is responsible for administering demands it, or for any other cause authorized by law."

{¶ 20} There are not many cases that address what standard applies for deciding when a guardian of an incompetent ward can be removed by order of the probate court. Addressing the issue after an extensive review of R.C. Chapter 2111 and the history of R.C. 2109.24, the Eleventh District concluded that "the best interests of the ward is a separate basis for removal of a guardian that is 'authorized' under the statutory scheme set forth in R.C. Chapter 2111" and, further that "the 'best interests' basis has historically fallen under the 'catchall' provision of R.C. 2109.24." *In re Guardianship of Spangler*, 11th Dist. Geauga No. 2007-G-2800, 2011-Ohio-6686, ¶ 558. The Eleventh District emphasized that "a probate court's ultimate concern is the welfare of the ward, and if it is established that the ward's general welfare could be better served through the appointment of a new guardian, the court has the general authority to proceed." *Id.* at ¶ 54. The Seventh District also has interpreted R.C. 2109.24 to allow for the removal of guardian "either for cause or simply in the interest of the guardianship." *In re C.W.*, 7th Dist. Columbiana No. 13 CO 44, 2014-Ohio-2934, ¶ 23; *see also In re Guardianship of Zborowski*, 8th Dist. Cuyahoga No. 99569, 2013-Ohio-3363, ¶ 17 (recognizing that the probate court must act in the best interest of the ward).

{¶ 21} "The removal of a guardian is within the sound discretion of the trial court,

and a reviewing court will not reverse the order of the trial court unless it appears that the lower court abused its discretion." *In re Guardianship of Poulos*, 8th Dist. Cuyahoga No. 96366, 2011-Ohio-6472, ¶ 27; *see also In re Guardianship of Babich*, 3d Dist. Marion No. 9-91-27, 1992 WL 63280, *2 (Mar. 24, 1992). An abuse of discretion suggests that a decision was unreasonable, arbitrary, or unconscionable. *State v. Perkins*, 3d Dist. Seneca No. 13-19-46, 2020-Ohio-2888, ¶ 11, citing *State v. Adams*, 62 Ohio St.2d 151, 157-158, 404 N.E.2d 144 (1980).

**{¶ 22}** When reviewing the trial court's findings, this court must be guided by the presumption that the trial court's findings were correct. *In re Guardianship of Miller* at ¶ 3. "The rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.* at ¶ 9. Thus, the judgment supported by competent, credible evidence shall not be reversed as an abuse of discretion. *Id.*

**{¶ 23}** Upon review of the evidence before the trial court, we find no abuse of discretion in the trial court's decision to deny Tallet's motion to remove Zimmerman as guardian of Rahbek's estate and her application to appoint her in his stead. Much of Tallet's testimony at the May 13 hearing focused on her interactions with medical professionals and care facilities and her efforts to ensure that her father's needs were being met, particularly since 2013 when his significant bladder issues began. Tallet criticized Zimmerman's alleged delegation to her of his duties regarding Rahbek's medical treatment and residential care, as well as Zimmerman's failure to spend time with Rahbek since his move to Patriot Ridge in June 2018.

{¶ 24} With respect to the financial aspects of Zimmerman's performance as guardian, Tallet described Zimmerman as reactive, rather than proactive, in terms of spending money for her father's benefit. Tallet stated that Zimmerman allowed her to purchase items for Rahbek when he moved from Hillside to Friends Care, but she testified that Zimmerman expressed to her that he did not think the trial court would agree to let her throw everything away (due to bed bug issues). Tallet testified that she had received some emails from Zimmerman that expressed concern about the cost of a particular housing location for Rahbek. Tallet stated that her father's resources could be better used to enhance his life, such as encouraging his love of art and electronics.

{¶ 25} Tallet testified that she is a teacher with a master's degree in education, has been yearbook director and has handled money for an entire school in two different districts, and is treasurer of a Cub Scout pack. Tallet stated that she carefully accounted for expenditures when her father lived with her. Tallet acknowledged that Zimmerman had sent her the guardian's accounts that he filed; the record reflects that Tallet has never objected to any of the guardian's accounts. Tallet testified that she did not receive copies of the applications for guardian fees and attorney fees, but she was aware of the payments from the guardian's accounts.

{¶ 26} During her testimony, Tallet agreed that she and Zimmerman had communicated probably hundreds of times over the years and had had a "pretty good" working relationship. Tallet could recall only one request that she had of Zimmerman regarding her father's medical care that Zimmerman denied, that being the purchase of a medical bed for her home. Other than the bed, Tallet agreed that Zimmerman had not denied a request by her for money for her father. Tallet was aware of discussions that

Zimmerman had with the VA and Patriot Ridge regarding Rahbek's ability to stay there for free. Tallet acknowledged that she was not alleging that Zimmerman had mishandled Rahbek's funds.

{¶ 27} Zimmerman also testified about his involvement with Rahbek's care. He indicated that he was involved in the admissions process for each place that Rahbek resided and that he previously had regular contact with Rahbek. Zimmerman stated that he had not been as involved in care conferences and had not visited recently since Tallet had taken on a more active role.

{¶ 28} With respect to financial matters, Zimmerman testified:

* * * Bill has made a number of requests of me and I've always purchased things for him. He's a, he's great tinkerer with things, he, he loves to draw, he loves listenin' to the radio. I've, I've purchased things on a number of occasions for him when he's requested them. There's not one time that I can ever re--, recall that anyone has made a request for Bill, um, for his betterment * * * that's a pleasure, that I have ever, ever said no to or not followed through with. Not one.

Zimmerman described Rahbek as a person who "takes joy in the simple things in life" and who "doesn't like to be extravagant with his money spending."

{¶ 29} Zimmerman acknowledged that he filed applications for both guardian fees and attorney fees. He described the difference as "if I could do it just as a lay person it would be under guardianship time; if I couldn't, then it would be under * * * attorney time." Zimmerman testified that he used the billing rate set by the probate court's local rule. Zimmerman stated that his bill was reduced significantly because of VA requirements and

had been reduced significantly for the past few years because of Tallet's increased involvement in addressing Rahbek's concerns.

{¶ 30} In denying Tallet's motion to remove Zimmerman as guardian of the estate, the trial court found:

> [Tallet's] proven performance as a personal caregiver to the Ward, however, is not the same as a determination by this Court that the handling and management of the Ward's estate – being equally important to the Ward's well-being – should be reassigned given the successful and proven performance of the current Guardian. The Guardian has worked well in making sure that recommended decisions on the Ward's personal care are properly evaluated taking into account the Ward's estate. There is no credible evidence showing that the Applicant and the Guardian cannot work well together, as they have in the past, for the Ward's benefit. The Applicant also has significantly less proven experience in handling such matters and the Guardian has proven his ability to competently handle the estate for the Ward. Overall, the Court finds no credible facts before this Court that it would be of a benefit to the Ward to substitute a new guardian of his estate.

{¶ 31} The record reflects that Zimmerman filed the required statements of account throughout the guardianship, and his applications for guardian fees and attorney fees had been accepted and paid without objection. Nothing in the records suggests financial mismanagement; to the contrary, the record indicates that Zimmerman has competently managed Rahbek's assets, which, as of the last accounting in the record (September

2018), totaled approximately $687,000. (*See* Guardian's Account, Sept. 27, 2018.) Both Zimmerman's and Tallet's testimony reflected that Zimmerman considered the financial implications of Tallet's requests for her father, but that he consistently approved expenditures for Rahbek as requested by Tallet. And, Tallet's own testimony supported the trial court's finding that Tallet and Zimmerman had communicated and worked well together in the past.

{¶ 32} In arguing that the trial court abused its discretion in denying her request to be appointed guardian of her father's estate, Tallet asserts that Zimmerman failed to meet the requirements of Sup.R. 66.09, that he violated his duty to Rahbek by executing the power of attorney, and that he charged "clearly excessive" guardian fees.

{¶ 33} Sup.R. 66.09, effective June 1, 2015, sets forth several responsibilities of a guardian to a ward. The provisions reflect that the guardian should, among other things, act in the ward's best interest, make decisions that impose the least restrictions on the ward's freedoms, meet with and get to know the ward, assess the appropriateness of the care being received, monitor and coordinate all services provided to the ward, and strive to honor the ward's preferences and belief system concerning extraordinary medical issues. Tallet emphasizes Sup.R. 66.09(F), which states:

(F) Communication with ward

(1) A guardian shall strive to know a ward's preferences and belief system by seeking information from the ward and the ward's family and friends.

(2) A guardian shall do all of the following:

(a) Meet with the ward as needed, but not less than once quarterly or as determined by the probate division of the court of common pleas;

(b) Communicate privately with the ward;

(c) Assess the ward's physical and mental conditions and limitations;

(d) Assess the appropriateness of the ward's current living arrangements;

(e) Assess the needs for additional services;

(f) Notify the court if the ward's level of care is not being met;

(g) Document all complaints made by a ward and assess the need to report

the complaints to the court of common pleas.

{¶ 34} Tallet claims that Zimmerman has not met the "letter and spirit" of Sup.R. 66.09 and of Sup.R. 66.09(F) in particular. She argues that the evidence established that Zimmerman does not proactively assess Rahbek's changing needs and that he has not visited Rahbek since Rahbek's move to Patriot Ridge in 2018. Tallet further notes that that Zimmerman's recent annual guardianship plan for the estate simply stated that "Guardian shall maintain Ward's eligibility to receive Social Security and Veteran's benefits." (*See* Annual Guardianship Plan, Sept. 27, 2018) Tallet argues that Zimmerman is not acting in Rahbek's best interest, because he has not been communicating with Rahbek about how Rahbek's "considerable financial resources" could be used to enhance Rahbek's life.

{¶ 35} Most of the deficiencies alleged by Tallet are more relevant to Zimmerman's performance as guardian of Rahbek's person than his performance as guardian of Rahbek's estate. Zimmerman acknowledged in his testimony that he had not visited Rahbek since his move to Patriot Ridge. However, the trial court reasonably found, based on the evidence, that Tallet "has been appropriately permitted by the Guardian [Zimmerman], as a family member, to be the eyes and ears of the Guardian to assist, as

needed, to make sure that the Ward's personal needs are being handled." The trial court stated that Tallet and Zimmerman "have been working very well together over the last couple years to attend to the needs of the Ward," and that the arrangement has "worked well for the benefit of the Ward." And, as to expenditures for Rahbek, the hearing testimony established that Zimmerman had talked with Rahbek over the years regarding items he wanted, that Rahbek was not an extravagant person, and that Zimmerman consistently approved requests by Tallet and Rahbek for purchases on Rahbek's behalf.

{¶ 36} The trial court indicated that, overall, it found no fault with Zimmerman's performance of his duties as guardian. Although Zimmerman might not have personally complied with every provision of Sup.R. 66.09, the trial court's conclusion about Zimmerman's overall performance was not unreasonable, particularly as it concerned Zimmerman's performance as guardian of Rahbek's estate.

{¶ 37} Tallet further asserts that Zimmerman breached his duty to Rahbek by delegating his responsibility as guardian to Tallet by means of the medical power of attorney. Regardless of whether Zimmerman was authorized to execute the power of attorney, under the facts before us, the trial court reasonably found that the power of attorney facilitated Tallet's involvement in her father's medical care, but did not represent an abdication of Zimmerman's responsibilities as guardian of Rahbek's person. Tallet and Zimmerman agreed that Tallet communicated regularly with Zimmerman regarding her father's needs and care, which is substantiated by Zimmerman's itemized guardian fee statements. Zimmerman testified that he was involved in effectuating the changes to Rahbek's residential placements and that he had participated in care conferences until recently. Zimmerman's itemized guardian fee statements indicate that he reviewed and

paid numerous medical bills related to Rahbek's care. Of particular relevance, Zimmerman did not delegate, in any respect, his responsibilities over Rahbek's estate, and he testified that he would not issue a power of attorney regarding financial matters.

{¶ 38} Finally, Tallet claims that Zimmerman has charged "clearly excessive" guardian fees, based on Zimmerman's use of his attorney rate to calculate his fee for his services as guardian. Tallet relies on *Dayton Bar Assn. v. Parisi*, 131 Ohio St.3d 345, 2012-Ohio-879, 965 N.E.2d 268, in which the Ohio Supreme Court noted that it had "previously denounced as a clearly excessive fee charging legal fees for nonlegal services." *Id.* at ¶ 25.

{¶ 39} In *Parisi*, a disciplinary case, the respondent-attorney charged over $220,000 for services provided by herself and her staff and for cost reimbursements during the nearly three years that she acted for the complainant, Royal John Greene, as his attorney-in-fact. The complainant and Parisi had orally agreed that Parisi would be paid at the attorney rate for legal and nonlegal services. *Id.* at ¶ 18. The Supreme Court noted that Parisi had provided some legal services to Greene, but the "bulk of her time   * * * was devoted to the nonlegal tasks of managing Greene's life." *Id.* at ¶ 19. The court stated that Parisi's billings "were replete with charges at her attorney rate for nonlegal services like arranging and attending Greene's doctors' appointments, handling mundane tasks related to Greene's cable-television and magazine subscriptions, researching local feline clubs, and arranging for the replacement of Greene's watch battery. She billed approximately $13,000 in fees and expenses for overseeing the partial restoration of Greene's beloved Jaguar." *Parisi* at ¶ 26.

{¶ 40} The Supreme Court agreed with the relator-bar association that Parisi

violated professional responsibility rules prohibiting a lawyer from charging or collecting an illegal or clearly excessive fee. The court reasoned: "Although relator did not present any expert testimony about the charges for Parisi's nonlegal services, it is clear that the bulk of those services required little, if any, legal skill and that the cost of providing the services was disproportionate to the benefit that Greene received. There is no question that those charges specifically addressed by relator and the scores of nonlegal services billed at attorney rates in Parisi's 404-page billing record are clearly excessive." *Id.* at ¶ 27.

{¶ 41} Sup.R. 73 leaves the matter of guardian compensation to local rule. Loc.R. 73.1(A) of the Common Pleas Court of Shelby County, Probate Division, establishes a schedule for determining guardianship compensation based on income, disbursements, and principal. It states:

A. A guardian shall be allowed compensation for income and disbursements as follows:

1. Income and Disbursements:

4% of the first $5,000.00 of income and disbursements

3% of the next $25,000.00 of income and disbursements

2% of the excess of $30,000.00 of income and disbursements

2. Principal:

$2.50 per thousand on the first $250,000.00 of market value

$1.50 per thousand on excess of $250.00 [sic] of market value

B. For purposes of determining compensation based on income the following shall not be considered income:

1. Receipt of corpus by guardian

2. Balance carried forward from prior accountings

3. Investment and reinvestment of corpus

The guardian fee calculation provided in Loc.R. 73.1(A) provides a presumptively reasonable guardianship fee. There is no requirement that the guardian file an itemized list of services provided as guardian.

{¶ 42} Under Loc.R. 73.1(E), a guardian may apply for additional compensation for extraordinary services and reimbursement for expenses incurred. The application for additional compensation must set forth an itemized statement of the services rendered and expenses incurred and the amount for which compensation is applied. The probate court must hold a hearing on the application unless the ward's next of kin residing in Ohio provides written consent for the extraordinary services and expenses.

{¶ 43} Because Rahbek was a veteran, Zimmerman's guardian compensation also was governed by R.C. 5905.13, which states, in relevant part, that "[c]ompensation payable to guardians shall be based upon services rendered and shall not exceed five per cent of the amount of moneys received during the period covered by the account required by section 5905.11 of the Revised Code."

{¶ 44} Loc.R. 71.2, which concerns counsel fees for guardians, further provides, in relevant part:

> When the attorney, law partner or firm associated is appointed as the guardian, the attorney shall keep accurate time records that separate the duties of the guardian from that of the attorney. Compensation shall be approved for the reasonable value of services performed as attorney and

as guardian. If the attorney fails to maintain accurate time records, the attorney will only be allowed the compensation determined under Rule 73.1 (Guardian's compensation).

Loc.R. 71.2(F).

**{¶ 45}** When Zimmerman was appointed Rahbek's guardian, he charged a rate of $100 per hour for attorney services, although he reduced his first counsel fee request pursuant to court rule (Motion for Attorney Fees, Sept. 18, 2007) and his first request for guardian fees employed the guardianship fee calculator. (Motion for Guardian Fees, Sept. 18, 2007.) In October 2009, Zimmerman's motion for guardian fees included an itemized billing statement and employed an hourly rate of $125, the same as his attorney rate. (Motion for Guardian Fees, Oct. 5, 2009.) The record's most recent application for attorney fees and for guardian fees used a rate of $190 per hour for attorney fees and $150 per hour for guardian fees. (Motion for Attorney and Guardian Fees, Sept. 27, 2018.) Zimmerman testified that he has reduced his bill significantly due to restrictions by the VA.

**{¶ 46}** Zimmerman has filed his applications for attorney fees and for guardian fees concurrently with the filing of the guardian's account, consistent with Loc.R. 73.1(D), which requires applications for approval of guardian fees to be filed preceding or simultaneous with the filing of a partial account or final account. Consequently, the trial court had before it a statement of Rahbek's income, disbursements, and principal when it reviewed Zimmerman's application for guardian fees. A review of the guardian accounts in the record reveals that the amount of guardian compensation permissible under Loc.R. 73.1 consistently exceeded the amount requested by Zimmerman using his

attorney rate. In September 2018, Zimmerman reduced his guardian fee request by $5,027.50 – down to $1,767.50 – to comply with regulations concerning guardians for veterans. Although Zimmerman arguably should not have calculated his requested guardian compensation using the same methodology as his request for attorney fees, the record does not substantiate that the requested amounts were "clearly excessive."

{¶ 47} Significantly, and unlike *Parisi*, Zimmerman was acting under the jurisdiction of the probate court, and his requests for guardian and counsel fees were submitted to and approved by the court. Tallet was served with the guardian's accounts and never objected. Tallet testified that she did not receive copies of the applications for fees, but she was aware that guardian fees and counsel fees were listed as disbursements on the filed guardian's account. Tallet did not complain about Zimmerman's fees at any time prior to filing her motion and application. Given that no objections were lodged against Zimmerman's requests for guardian fees and the requests appeared to be reasonable, the trial court did not abuse its discretion in failing to remove Zimmerman as guardian of Rahbek's estate based on Zimmerman's requested guardian fees.

{¶ 48} In determining whether it was in Rahbek's best interest to remove Zimmerman as guardian of Rahbek's estate and to appoint Tallet in his place, the trial court had evidence regarding Zimmerman's relationships with Rahbek and Tallet, Zimmerman's communications with Rahbek's care providers, Zimmerman's long-term management of Rahbek's accounts (including his handling of requested expenditures), Zimmerman's itemized requests for guardian fees and counsel fees, and Tallet's experience with financial management. Upon review of the evidence, the trial court

reasonably concluded that retaining Zimmerman as guardian of Rahbek's estate was in Rahbek's best interest.   Accordingly, Tallet's assignment of error is overruled.

{¶ 49} The judgment of the Common Pleas Court of Shelby County, Probate Division, will be affirmed.

. . . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies sent to:

William R. Zimmerman Jr.
David J. Cusack
Hon. Jeffrey J. Beigel